Filed 10/21/21 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JO ANN STROBEL,<br><br>　　　Plaintiff and Appellant,<br><br>　　　　　v.<br><br>JOHNSON & JOHNSON et al.,<br>　　　Defendants and Respondents. | A159609<br><br>(Solano County Super. Ct.<br>No. FCS052548)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING;<br>NO CHANGE IN JUDGMENT |

THE COURT[*]:

The petition for rehearing filed by respondents Johnson & Johnson et al., is denied, subject to the following modification of the opinion filed in this appeal on September 21, 2021:

1. On page 1, in the second sentence of the first paragraph after the words, "Before his death, Strobel sued" delete the words "Johnson & Johnson (J&J)" and substitute the words "Johnson & Johnson and Johnson & Johnson Consumer Inc. (collectively, J&J)" so the sentence reads:

> Before his death, Strobel sued Johnson & Johnson and Johnson & Johnson Consumer Inc. (collectively, J&J) for damages under product liability, negligence and fraud theories, alleging that continuous exposure to asbestos in J&J's Baby Powder (JBP), a product he used regularly for some sixty years, was a substantial contributing cause of his mesothelioma.

---

[*] Streeter, Acting P. J., Tucher, J. (Presiding Justice of the Court of Appeal, First Appellate District, Division Three, sitting by assignment pursuant to article VI, section 6 of the California Constitution), Brown, J.

2. On page 1, in the first paragraph, delete the following sentence:

> Strobel's wife, Jo Ann, a coplaintiff who substituted in as the sole appellant after his death, seeks recovery for loss of consortium.

Insert in place of the deleted sentence indicated above, continuing within the same paragraph, the following substitute language:

> Strobel's wife, Jo Ann, a coplaintiff who substituted in after his death as successor-in-interest to the claims he filed, also seeks recovery for loss of consortium.

3. On page 1, in the second paragraph, delete the following sentence:

> Pointing to the declaration of J&J's expert, Dr. Matthew Sanchez, who swore that JBP was at all relevant times asbestos-free, the court ruled that the Strobels failed to present evidence creating a triable issue of legal causation.

Insert in place of the deleted sentence indicated above, continuing within the same paragraph, the following substitute language:

> Pointing to declarations of J&J's experts, Matthew Sanchez, who swore that JBP was at all relevant times asbestos-free, and Suresh Moolgavkar, who opined that there is no credible scientific evidence that even high-level exposure to cosmetic talc increases the risk of mesothelioma, the court ruled that the Strobels failed to present evidence creating a triable issue of legal causation.

4. On page 1, in the third sentence of the second paragraph, delete the abbreviation "Drs." before "Sean Fitzgerald" and delete the abbreviation "Mr." before "Charles Ay" so the sentence reads:

> The Strobels filed declarations from five experts, Sean Fitzgerald, Steven Compton, Murray Finkelstein, Richard Cohen, and Charles Ay, all contradicting J&J's experts on this point.

5. On page 2, in the second sentence of the first paragraph, delete the abbreviation "Drs." so the sentence reads:

> It then concluded that, after the exclusion of this testimony, the Strobels could not bear their burden of proof on legal causation because what was left—the opinions from Fitzgerald and Compton—only confirmed the presence of asbestos in the

talcum ore J&J used to manufacture JBP, not in JBP offered for sale as a finished product during the years Doug Strobel used it.

6. On page 4, in the first sentence of the first full paragraph, insert the phrase "that is often" after the words "signal tumor" so the sentence reads:

> Among all the physicians who submitted declarations for and against summary judgment, it was undisputed that mesothelioma is a signal tumor that is often associated with exposure to asbestos.

7. On page 4, footnote 3, in the last sentence—after the phrase "Dr. Sanchez, a geologist"—insert the phrase "whose several degrees in geology include a Ph.D.," so the sentence reads:

> Dr. Sanchez, a geologist whose several degrees in geology include a Ph.D., specializes in "characterizing asbestos in raw materials and in building products and the development of asbestos analytical methods."

8. On page 7, in the second paragraph, delete the following sentence:

> In the process of being crushed in the talcum powder milling process, asbestiform bundles are easily separated into long, thin, flexible fibers.

9. On page 8, at the beginning of the first sentence of the second full paragraph, delete the phrase, "As a result," and substitute the phrase, "Because of this shared geological provenance," so the sentence reads:

> Because of this shared geological provenance, asbestos is often found intergrown as an "accessory mineral" within a talc deposit.

10. On pages 8 and 9, in the third paragraph that begins on page 8 and continues on page 9—after the first sentence which concludes ". . . as all of these minerals are hydroxylated magnesium silicates."—insert the following sentence, continuing within the same paragraph:

> According to him, the asbestos "contamination of . . . talcum powder products" comes from "the mining process, since ore specimens taken directly from the mines have . . . repeatedly been tested and proven to contain asbestos, most often anthophyllite and tremolite, but also serpentine chrysotile asbestos."

3

11. On pages 8 and 9, in the last sentence of the third paragraph which begins on page 8 and continues on page 9—after the phrase "of those three,"—insert the word "minerals" so the sentence reads:

> And according to Drs. Cohen and Finkelstein, who add an epidemiology perspective, of those three minerals, all have documented histories as carcinogens when humans are exposed to them in dust form.

12. On page 13, in the second sentence of the first full paragraph, delete the phrase "Drs. Fitzgerald and Compton" and insert the phrase "Mr. Fitzgerald and Dr. Compton" so the sentence reads:

> After scrutinizing the Strobels' evidence in opposition to the motion, the trial court assumed arguendo that the Strobels had presented through Mr. Fitzgerald and Dr. Compton "competent direct evidence that samples of source ore associated with deposits at some source mines have been found to contain asbestos."

13. On page 17, in the second sentence of the first full paragraph, delete the phrase "Drs. Compton and Fitzgerald" and substitute the phrase "Dr. Compton and Mr. Fitzgerald" so the sentence reads:

> On summary judgment, the parties offered the court two starkly different expert perspectives: There was, on the one hand, the view presented by Dr. Compton and Mr. Fitzgerald that J&J obtained talc ore from sources contaminated with asbestos during the exposure period, a premise from which these experts draw the inference that asbestos was present in JBP when Doug Strobel used it.

14. On page 19, in the last sentence of the first partial paragraph at the top of the page, delete the phrase "Drs. Fitzgerald and Compton" and replace it with the phrase "Mr. Fitzgerald and Dr. Compton" so the sentence reads:

> Whatever the merits of this line of critique, it goes to the weight and not the admissibility of the opinions offered by Mr. Fitzgerald and Dr. Compton confirming the presence of asbestos in Italian and Vermont source ore.

15. On page 23, in the first full paragraph, first sentence beginning "As in *Lyons*," delete the phrase "together with expert testimony reporting positive test results for the presence in the source ore

used to manufacture the product" and replace it with the phrase, "together with expert testimony reporting positive test results for the presence of asbestos in ore from the sources used to manufacture the product" so the sentence reads:

> As in *Lyons*, the summary judgment record here shows long term use of a talcum powder product alleged to contain asbestos by a mesothelioma sufferer who was not exposed to any other known source of asbestos above background asbestos levels that are ever-present in the environment, together with expert testimony reporting positive test results for the presence of asbestos in ore from the sources used to manufacture the product.

16. On page 23, in the second sentence of the first full paragraph—after the phrase "eliminated in the process of"—insert the phrase "mining and then" so the sentence reads:

> In the absence of evidence explaining how asbestos in the source ore would have been eliminated in the process of mining and then milling talc, that is enough to support more than a mere possibility that the accused product here, JBP, was a substantial factor in causing Doug Strobel to develop mesothelioma.

17. On page 38, in the last paragraph of footnote 19, delete the phrase "Drs. Fitzgerald or Sanchez" and replace it with the phrase "Mr. Fitzgerald or Dr. Sanchez" so the sentence reads:

> We take no view of whether, on appropriate objection at trial, any of the third-party sources relied upon by Mr. Fitzgerald or Dr. Sanchez may be excludable on hearsay or other grounds, in whole or in part.

18. On page 39, in the fourth sentence of the first full paragraph, change the phrase "Dr. Fitzgerald" to "Mr. Fitzgerald and Dr. Compton" so the sentence begins:

> J&J has many points of disagreement with Mr. Fitzgerald and Dr. Compton, . . . .

5

19. On page 39, also in the fourth sentence of the first full paragraph, immediately after the phrase (modified as indicated in paragraph 18 above) "J&J has many points of disagreement with Mr. Fitzgerald and Dr. Compton," add as footnote 20 the following text, which will require renumbering all subsequent footnotes:

> [20] In a petition for rehearing, J&J, shifting from its primary focus on Mr. Fitzgerald, claims that Dr. Compton's "mine samples (from Italy and Vermont) were insufficient to show it was more likely than not that JBP used by Mr. Strobel was contaminated with asbestos." J&J points out Dr. Compton "admitted he used a testing methodology that cannot distinguish asbestos fibers from non-asbestos particles." It also says "Compton's mine samples were not shown to have been taken during the years when J&J sourced cosmetic talc for JBP from certain mines in Italy (1946 to 1967/1968) and Vermont (1967/1968 to 2003) for use in its cosmetic-talc products. . . . Instead, Compton's samples were acquired many years later—long after the deposits of cosmetic talc mined for use by J&J were already gone." To the extent these arguments have not been rejected already because they are redundant to the attacks J&J mounts against the declaration of Mr. Fitzgerald—who also tested source ore from the same Italian mine samples and found them to be positive for asbestos—they are new, having been raised only obliquely in a footnote to the responding brief. We decline to address them on rehearing.

20. Throughout the opinion text, footnotes, and headings, all remaining occurrences of "Dr. Fitzgerald" should be changed to "Mr. Fitzgerald."

21. On pages 39 and 40, in the third sentence of the second paragraph which begins on page 39 and continues on page 40, change the phrase "dating from the late 1940's" to "dating from prior to 1950" so the sentence reads:

> Mr. Fitzgerald confirmed through his own testing that there is asbestos contamination in archival samples of JBP dating from prior to 1950, which is consistent with testing on samples of source ore from the Val Chisone and Val Germanasca region conducted by him and by Dr. Compton.

6

22. On page 43, immediately before part III. DISPOSITION, insert a new part II.C. with subheading and text, inclusive of new footnotes numbered 22, 23, and 24, as follows:

### C. *Coda: Eleventh-Hour Suggestion of Bankruptcy*

Late in the day on October 15, 2021, while a petition for rehearing filed by J&J was still pending, and six days before this court's September 21, 2021 published opinion was to become final (Cal. Rules of Court, rule 8.264(b)(1)), J&J filed a document styled "Notice of Bankruptcy Filing and Stay of Proceedings" (the Suggestion of Bankruptcy). The Suggestion of Bankruptcy states that, on October 14, 2021, one of the two defendants in this case, Johnson & Johnson Consumer Inc. (JJCI), merged itself out of existence in a merger with an entity known as LTL Management LLC (LTL); that as a result of a "corporate restructuring," LTL "is now responsible for the talc-related claims asserted against" the former JJCI; that, on October 15, 2021, LTL filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of North Carolina; and that, under the automatic stay imposed by section 362 of the Bankruptcy Code (11 U.S.C. § 362), "all claims asserted against LTL in . . . [this appeal] are stayed absent an order of the Bankruptcy Court lifting or modifying" the stay.

Attached to the Suggestion of Bankruptcy is a copy of LTL's Chapter 11 bankruptcy petition and a long list of entities which are collectively defined as "the LTL Defendants." Both JJCI and its nonbankrupt codefendant in this case, Johnson & Johnson, are among the entities defined as "the LTL Defendants." The Suggestion of Bankruptcy states that the automatic stay in the LTL bankruptcy extends to any non-bankrupt entity defined as one of "the LTL Defendants" because all of these entities allegedly "share such an identity of interest with LTL that LTL is, in effect, the real-party defendant in any claims asserted against them" and "prosecution of the talc-related claims against any LTL Defendant would allow plaintiffs to fix claims against LTL—particularly through indemnity or alleged indemnity obligations, but also through collateral estoppel, res judicata and evidentiary prejudice."

Following receipt of the Suggestion of Bankruptcy, we directed J&J and invited the Strobels to file memoranda

7

addressing how, if at all, the automatic stay in the LTL bankruptcy affects this appeal and any further proceedings in this case. Having considered the parties' filings in response to that order, we now add as a coda to our previously filed opinion a brief discussion of some novel issues raised by the Suggestion of Bankruptcy. Without addressing whether the LTL bankruptcy stay operates to suspend the running of the 30-day clock on our power to act on the pending rehearing petition under California Rules of Court, rules 8.264(b)(1) and (c)(1) and 8.268(a)(2)—we doubt that it does, even assuming the stay applies to this appeal—J&J takes the position that the stay blocks any and all further action by this court in the final stage of these appellate proceedings, presumably including the filing of the remittitur. The Strobels disagree. They take the position that LTL is not a party to this appeal or the underlying litigation, and thus that the LTL bankruptcy stay does not extend to the claims they are asserting against the defendant J&J entities that are named in this case, JJCI as well as its corporate parent Johnson & Johnson, on appeal or in the underlying proceeding.

With the appeal in its present posture, we conclude that the Strobels have the better argument. Section 362(a)(1) of the United States Bankruptcy Code (11 U.S.C. § 362(a)(1)) provides that an automatic stay imposed upon the filing of a bankruptcy proceeding shall stay "the commencement or continuation . . . of a judicial . . . proceeding against the debtor." The debtor in the bankruptcy proceeding at issue here is LTL. Because LTL is not a party to this appeal, the appeal does not qualify as a "judicial . . . proceeding against the debtor." Although a merger of JJCI and LTL has apparently taken place under Texas law, this appeal may continue against JJCI[22] at least until a

---

[22] California and Texas both have statutes providing that a proceeding against a corporation that has been merged out of existence may continue despite the merger. (See Tex. Bus. Orgs. Code Ann., § 10.008, subd. (a)(5) ["any proceeding pending by or against any domestic entity or by or against any non-code organization that is a party to the merger may be continued as if the merger did not occur, or the surviving or new domestic entity or entities or the surviving or new non-code organization or non-code organizations . . . under the plan of merger may be substituted in the proceeding"]; Corp. Code, § 1107, subd. (d) [similar].) The procedural circumstances are analogous to the situation Mrs. Strobel faced as a result of the passing of her husband during the pendency of the appeal. The claims currently being pursued on behalf of the late Mr. Strobel did not abate as a

successful motion is made to substitute LTL as a party. (Cal. Rules of Court, rule 8.36(a).) No such motion has been made. When, and if, LTL is substituted as a party in the proceedings on remand, a question may arise as to whether the automatic stay in LTL's bankruptcy stays the entire case, including any further litigation against Johnson & Johnson. But that question is not yet ripe for decision.

We also note that, in line with the rule articulated in *Royal Truck & Trailer v. Armadora, etc.* (N.D.Ill. 1981) 10 B.R. 488, the Ninth Circuit has "consistently held that the automatic stay does not apply to suits against nondebtors." (*In re Excel Innovations, Inc.* (9th Cir. 2007) 502 F.3d 1086, 1095, citing *In re Chugach Forest Products, Inc.* (9th Cir. 1994) 23 F.3d 241, 246.) *Royal Truck & Trailer* states a generally accepted rule, not only in the Ninth Circuit, but across the country. (See *Matter of Johns-Manville Corp.* (Bankr. S.D.N.Y. 1983) 26 B.R. 405, 412 ["Courts across the country have been faced with the dilemma of whether to proceed in asbestos litigation in the absence of a co-defendant which has filed for Chapter 11. . . . [¶] The courts in the above-cited cases have followed the rationale of *Royal Truck* and have relied on the plain language of [title 11 United States Code] Section 362(a) which acts as a stay of actions against the debtor only"].)

Some courts recognize a "narrow exception" to this general rule. (*In re Pitts* (Bankr. E.D.N.Y., Dec. 8, 2009, No. 808-74860-reg) 2009 WL 4807615, at p. *5.) The leading authority for the exception, a Fourth Circuit case decided in the context of what was known in the 1980's as the Dalkon Shield litigation, is *A.H. Robins Co., Inc. v. Piccinin* (4th Cir. 1986) 788 F.2d 994. As explained in *A.H. Robins*, there may be " 'unusual circumstances' " "when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." (*Id.* at p. 999.) The *A.H. Robins* court identified such a situation where a suit has been commenced

result of his death. (See Code Civ. Proc., §§ 377.20, 377.21, 377.30.) And on August 5, 2020, we granted a motion permitting Mrs. Strobel to substitute herself as her late husband's personal representative. (See Code Civ. Proc., § 377.31.) The procedural step of substituting a successor for a deceased natural person is no more self-executing than it is for a corporation that has been merged out of existence.

9

against a third party that is entitled to absolute indemnity from the debtor as a result of any judgment that might be entered against the third party in the non-bankruptcy case. (*Ibid*; see *In re Aldrich Pump LLC* (Bankr. W.D.N.C., Aug. 23, 2021, No. 20-30608 (JCW)) 2021 WL 3729335, at pp. *1, *4, *30–*31 [finding the narrow circumstances described in *A.H. Robins* were present and issuing a nationwide preliminary injunction that extended an automatic bankruptcy stay to claims against non-debtor insurance companies and other parties holding contractual indemnity rights that could in turn be asserted against Chapter 11 petitioners].)[23]

According to J&J, "Upon the filing of LTL's chapter 11 case, the automatic stay imposed by section 362 of the Bankruptcy Code . . . took immediate effect and, as a result, all claims asserted against LTL in this matter are stayed . . . ." "Further," J&J contends, "as a result of the automatic stay, no

---

[23] Neither *A.H. Robins* nor *Aldrich Pump* is entirely clear about whether title 11 United States Code section 362, alone, is the source of authority for the stays they authorize. Both courts also invoke the powers of bankruptcy courts to issue injunctive relief under title 11 United States Code section 105 (and, in the case of *A.H. Robins*, the general equity powers of bankruptcy courts as well), and they apply a traditional injunction analysis in addition to the criteria governing automatic stays. (*A.H. Robins Co., Inc. v. Piccinin, supra,* 788 F.2d at pp. 998–999, 1002–1004, 1008; *In re Aldrich Pump LLC, supra,* 2021 WL 3729335, at pp. *3, *5, *23, *30–*33.) This ambiguity in the precise source of bankruptcy courts' power to enjoin proceedings involving nondebtors has cast some doubt on whether an "unusual circumstances" exception to the general scope of title 11 United States Code section 362, which normally extends protection only to the debtor, exists at all. (See *In re Excel Innovations, Inc., supra,* 502 F.3d at pp. 1096, 1098; *In re Chugach Forest Products, Inc., supra,* 23 F.3d at p. 247 & fn. 6.) The Ninth Circuit has stated that, " ' "[s]uch extensions, although referred to as extensions of the automatic stay, [are] in fact injunctions issued by the bankruptcy court after hearing and the establishment of unusual need to take this action to protect the administration of the bankruptcy estate." ' " (*Boucher v. Shaw* (9th Cir. 2009) 572 F.3d 1087, 1093, fn. 3.)

further action may be taken to prosecute the talc-related claims against J&J or Old JJCI"—in this appeal or in proceedings on remand—"absent an order of the bankruptcy court lifting or modifying the automatic stay . . . as to such claims." In taking this position, we think J&J is getting out ahead of the course of events. J&J points to nothing in the record of this case to justify its position and fails to account for such basic legal points as the existence of a recognized exception to title 11 United States Code section 362 for ministerial acts. (See *In re Pettit* (9th Cir. 2000) 217 F.3d 1072, 1080 [The "ministerial act exception" "stems from the common-sense principle that a judicial 'proceeding' within the meaning of section 362(a) ends once a decision on the merits has been rendered. Ministerial acts or automatic occurrences that entail no deliberation, discretion, or judicial involvement do not constitute continuations of such a proceeding"].) J&J's response to our order directing it to explain the basis for its view that the automatic stay in the LTL bankruptcy blocks final completion of these appellate proceedings consists of little more than a conclusory statement reiterating the information in the Suggestion of Bankruptcy, accompanied by 247 pages of extra-record pleadings and attachments recently filed with the LTL bankruptcy court, including a motion asking that court to issue the same type of injunctive relief it recently ordered in a different case on a different record. (See *In re Aldrich Pump LLC*, *supra*, 2021 WL 3729335.)

As for the impact, if any, of the LTL bankruptcy stay on the proceedings in the trial court following issuance of the remittitur, that remains to be seen. What we can say at this point is that J&J has not persuaded us, on the record as it now stands, based on the automatic stay alone, that there is any impediment to further proceedings in this court or in the trial court on remand. We intimate no view of whether we might reach a different conclusion if J&J made some showing—beyond simple representations of counsel backed up by a raft of extra-record pleadings and attachments—that sufficiently "unusual circumstances" exist to trigger the identity-of-interest exception to the general rule limiting an automatic bankruptcy stay to

11

proceedings against the debtor.[24]  Nor are we prepared to say whether the situation might change if the bankruptcy court were to issue a nationwide injunction enjoining further proceedings in all cases involving the "LTL Debtors," as J&J appears to have requested. We can envision a variety of delicate issues of comity between state and federal courts arising from such a far-reaching order, but it is premature to comment on those issues now.

The modifications effect no change in the judgment.

Dated:  October 21, 2021                                    STREETER, Acting P. J.

---

[24] It is entirely possible that discovery may be necessary to ensure there is an adequate record to decide the "identity of interest" issue.  For example, the law of corporate successorship, which may bear upon the issue, is not only complex and highly fact-specific (see, e.g., *Hernandez v. Enterprise Rent-A-Car Co. of San Francisco* (2019) 37 Cal.App.5th 187), but may implicate choice-of-law and federal preemption questions the answers to which are not obvious on the skimpy record we have.

Trial Court:  Solano County Superior Court

Trial Judge:  Hon. Wendy G. Getty

Counsel:      Brayton Purcell, Gilbert L. Purcell, Richard M. Grant,
              Steven J. Patti, Christine A. Renken,
              for Plaintiff and Appellant.

      King & Spalding, Paul R. Johnson, Alexander G. Calfo,
              Susan V. Vargas, Stacy L. Foster; Orrick Herrington &
              Sutcliffe, Robert M. Loeb, *pro hac vice*, Nathan Dullum,
              for Defendants and Respondents.

Filed 9/21/21 (unmodified opinion)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| JO ANN STROBEL,<br><br>        Plaintiff and Appellant,<br><br>                    v.<br><br>JOHNSON & JOHNSON et al.,<br><br>        Defendants and Respondents. | A159609<br><br>(Solano County Super. Ct.<br>No. FCS052548) |

Douglas Strobel was diagnosed with malignant mesothelioma in February 2019 and passed away at age 68 in April 2020, during the pendency of this appeal. Before his death, Strobel sued Johnson & Johnson (J&J) for damages under product liability, negligence and fraud theories, alleging that continuous exposure to asbestos in J&J's Baby Powder (JBP), a product he used regularly for some sixty years, was a substantial contributing cause of his mesothelioma. Strobel's wife, Jo Ann, a coplaintiff who substituted in as the sole appellant after his death, seeks recovery for loss of consortium.

The trial court granted summary judgment for J&J. Pointing to the declaration of J&J's expert, Dr. Matthew Sanchez, who swore that JBP was at all relevant times asbestos-free, the court ruled that the Strobels failed to present evidence creating a triable issue of legal causation. The Strobels filed declarations from five experts, Drs. Sean Fitzgerald, Steven Compton, Murray Finkelstein, and Richard Cohen, and Mr. Charles Ay, all contradicting J&J's experts on this point.

1

The court sustained J&J's hearsay objections to much of the Strobels' proffered expert testimony under *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*) and for lack of foundation. It then concluded that, after the exclusion of this testimony, the Strobels could not bear their burden of proof on legal causation because what was left—the opinions from Drs. Fitzgerald and Compton—only confirmed the presence of asbestos in the talcum ore J&J used to manufacture JBP, not in JBP offered for sale as a finished product during the years Doug Strobel used it. Without relying on case-specific hearsay about which these experts had no personal knowledge, the court ruled, they could only speculate about the presence of asbestos in JBP during the exposure period.

This appeal followed the entry of judgment for J&J. We now reverse.

## I. BACKGROUND

### A. *Doug Strobel's History of Using JBP*

Starting shortly after his birth in 1951, Doug Strobel's mother regularly used JBP when diapering him as an infant. As a young boy, Doug developed what would become a lifelong habit of applying JBP on himself, coating his feet in it and dumping it in his shoes after little league baseball practice to reduce odor. When he applied JBP to his feet in this way, a cloud of it would arise around him. Doug continued this habit as he grew older, applying JBP to his feet two to three times a week for nearly six decades, until 2014. Every two months or so, his wife, Jo Ann, routinely bought containers of JBP for Doug's use, as his mother had done when he was a boy. One of the Strobels' experts testified that, over the course of his lifetime, Doug Strobel used at least 338 containers of JBP. While none of this is disputed, whether asbestos was present in JBP during the six-decade exposure period is a matter of sharp dispute.

2

**B.** *Whether JBP Was Contaminated with Asbestos:  The State of the Evidence on Summary Judgment*

The Strobels were unable to produce any containers of the JBP that Doug Strobel actually used or to arrange for testing of the contents of those containers, since all of them were consumed years ago.  But the Strobels did make a showing that, over the course of Doug Strobel's lifetime, he was not exposed to asbestos from any source other than JBP.[4]  Generally speaking, the proof bearing on whether JBP contained asbestos during the period 1951 through 2014 fell into two categories.  First, there were opinions from physicians specializing in asbestos-related diseases who considered Doug Strobel's lifetime habit of using JBP and addressed whether it was a likely cause of his mesothelioma (Drs. Cohen and Finkelstein for the Strobels and Dr. Moolgavkar for J&J[5]).  Second, there was evidence from geologists and

_____

[4] The absence of some source of asbestos exposure other than JBP is the thrust of the expert declaration from Charles Ay, a certified consultant with expertise in workplace asbestos exposure.  Ay identifies 12 types of commonly used industrial products that are known to contain asbestos (joint compound, fireproofing, gaskets and packing, brakes and clutches, dryer felts, asbestos-cement pipe, gloves and cloth, electrical insulation, floor tile, thermal systems insulation, gun plastic cement, and stucco).  Having worked for many years as a pipefitter in the marine insulation and construction industries, Ay gained familiarity with the nature and properties of asbestos by actually working with these asbestos-containing industrial products.

[5] Dr. Cohen, a clinician with a private practice, and Dr. Finkelstein, a retired government consultant on asbestos regulation, are both professors of occupational health and environmental medicine.  Dr. Moolgavkar is a cancer epidemiologist and research scientist.  Although Drs. Cohen, Finkelstein, and Moolgavkar have widely varying professional profiles, each is a physician with special expertise in one or both of the fields of epidemiology (the incidence, patterns, and causes of disease in human populations) and industrial toxicology (the investigation of the health effects of dust, chemicals, metals, toxic materials, and physical agents on workers who may be exposed in the workplace).

asbestos detection experts who conducted geological and mineralogical analyses, using microscopic examinations and other techniques to test for the presence of asbestos in JBP milled as a finished product and in the source talc ore used to manufacture it (for the Strobels, Dr. Compton [source ore only] and Dr. Fitzgerald [source ore and milled JBP], and for J&J, Dr. Sanchez [source ore and milled JBP][6]).

Among all the physicians who submitted declarations for and against summary judgment, it was undisputed that mesothelioma is a signal tumor almost always associated with exposure to asbestos.  Dr. Cohen opined without contradiction that inhaled asbestos fibers can become lodged in the lungs or the pleural cavity around the lungs, and that when the body is unable to expel these fibers through its natural immune response, they may cause genetic damage at the cellular level, ultimately causing mesothelioma. Dr. Cohen further opined, here too without contradiction, that there may be a long latency period between exposure to asbestos and the development of asbestos-related diseases (10–50 years is "normal"); that "mesothelioma is a very low dose disease, with no known minimum threshold of exposure to

---

[6] Dr. Compton, a physicist, works in the areas of "particle analysis, asbestos analysis, industrial hygiene, and the physics of small particles."  He specializes in "the identification, measurement and analysis of materials, determining the constituent ingredients in materials, and characterizing those materials and ingredients, including asbestos and talc."  Dr. Fitzgerald is "a licensed Professional Geologist, mineralogist and asbestos expert, with over 30 years of experience analyzing asbestos minerals and researching and developing the science of asbestos."  He is familiar with regulatory standards governing asbestos and has "substantial training and experience in the analysis of asbestos and asbestos-containing materials, including transmission electron microscopy, scanning electron microscopy, x-ray diffraction and polarized light microscopy."  Dr. Sanchez, a geologist, specializes in "characterizing asbestos in raw materials and in building products and the development of asbestos analytical methods."

4

asbestos below which there is no risk"; and that the chance of disease developing from exposure to asbestos is "proportional to" cumulative dosage over time.

From there, however, the physicians for each side sharply disagreed. For the Strobels, Dr. Cohen opined that "to a reasonable degree of medical certainty . . . [the JBP] Douglas Strobel used and was exposed to for decades, starting 68 years ago" contained asbestos "above normal background levels"; "that his use of and exposure to asbestos from [JBP] was a significant and impactful contributing factor in the development of his mesothelioma"; and that "Douglas Strobel's exposure to asbestos was the cause of his mesothelioma." Dr. Finkelstein concurred. J&J, for its part, contended that Doug Strobel's mother sometimes used a brand of cosmetic talcum powder manufactured by Colgate-Palmolive rather than JBP, but did not dispute the absence of any unusual source of asbestos exposure in Doug Strobel's life other than talcum powder, nor did it claim he had any habits such as smoking that put his lungs at particular risk. Rather, J&J disputed legal causation based on Dr. Moolgavkar's view that mesothelioma, like all cancers, can develop spontaneously, that mesothelioma may be triggered by any number of carcinogens commonly found in today's environment, and that the risk of contracting mesothelioma is strongly correlated with a person's age.

The principal difference between the physician experts was this. The Strobels' physicians gave weight to the opinions of Drs. Fitzgerald and Compton, who each attested that consumer powders made from talc produced from the mining regions where J&J obtained talc contained asbestos, while Dr. Moolgavkar did not, giving weight instead to the likelihood of other potential asbestos exposure sources and general risks that anyone may face

5

in developing mesothelioma. The Strobels' physicians cited the extensive literature relating to the geology and mineralogy of asbestos, discussed testing methodologies for detecting asbestos, and used statistical analysis—extrapolating from the frequency and incidence of positive asbestos findings in the tests undertaken by others—to opine on the percentage likelihood that asbestos would be present in any given container of JBP during the time Doug Strobel used it. But because none of the physicians actually conducted any tests for the presence of asbestos in JBP or in the talc ore used to manufacture JBP, the testimony of the geologists and asbestos testing experts had dispositive significance in the trial court's analysis.

As further explained below, the trial court ruled that Dr. Compton's and Dr. Fitzgerald's declarations, to the extent they infer the presence of asbestos in milled, finished talcum powder from nothing more than positive tests for asbestos in raw talc ore used to manufacture it, are legally insufficient to create a triable issue of fact under applicable principles of causation. And to the extent Dr. Fitzgerald's declaration went beyond that, opining that asbestos was present in JBP itself during the exposure period, the court ruled that his opinion constituted inadmissible case-specific hearsay under *Sanchez*, *supra*, 63 Cal.4th at pages 684–686, which in effect left the opinions of Dr. Sanchez and Dr. Moolgavkar unrebutted.

C. *The Geology and Mineralogy of Talcum and Asbestos*

To frame the issues that divided the opposing experts in this case in a more specific way, we pause for a brief tour through the science that undergirds their opinions. Much of that science is undisputed. Talcum, or "talc" as the parties refer to it in shorthand, is a hydrated magnesium silicate mineral. One of the softest minerals on earth, at the far end of a spectrum opposite to, say, diamond, talc is used in a wide variety of commercial applications ranging from pharmaceuticals and cosmetics to ceramics, paints,

6

paper, and asphalt roofing.  Talcum powder, a talc-based cosmetic product, is manufactured by a milling process in which large pieces of talc ore are crushed and pulverized into fine-grained powder.

There are essentially two types of talc ores, industrial grade and cosmetic/pharmaceutical grade, depending on the particular deposit from which the ore comes.  Talc deposits vary with regard to chemistry, morphology and habit.  Chemistry in this context refers to the elemental composition of a mineral.[7]  Morphology refers to the size and shape of particles in a mineral.  And habit refers to the form, crystal structure and texture in which a mineral is found in nature.  Certain talc deposits, valued for their purity, softness and fine particle size, tend to be the ones used for cosmetic products.

"Asbestos" is a collective term describing a regulated group of six naturally occurring, highly fibrous silicate minerals that grow in a unique crystalline form as bundles.  Geologists describe this growth habit as "asbestiform."  In the process of being crushed in the talcum powder milling process, asbestiform bundles are easily separated into long, thin, flexible fibers.  When crystallized in an asbestiform habit, the six minerals that are regulated as asbestos fall into two mineral families:  serpentine and amphibole.  Both mineral families grow in asbestiform and nonasbestiform

---

[7] To geologists, a "mineral" is a regular and specific arrangement of a given chemistry (chemical elements that are present in a certain ratio or amount).  Only ten elements in the periodic table of elements make up 98.8 percent of the earth's crust, namely, in order of abundance:  oxygen, silicon, aluminum, iron, calcium, sodium, potassium, magnesium, titanium, and hydrogen.  "Silicates," which are made up of four oxygen atoms bonded to a single silicon atom and arranged in the pyramidal shape of a tetrahedron, are a family of minerals.

habits.  Serpentine and amphibole minerals with a nonasbestiform morphology are not regulated as asbestos.

Talc and asbestos minerals are distinct, but they are closely related in their geological formation and thus often found together in nature.  Because magnesium, silica, and water are the essential ingredients in talc and asbestos, both minerals form under the same conditions.  They both grow within formations of either continental rock or ocean crustal rock.  Continental rock, which includes layered sedimentary rock of many varieties, is dominated by the elements silicon and aluminum, while ocean crustal rock, known as basalt—and further classified by geologists as either mafic or ultramafic in origin—is both silica poor and magnesium and iron rich.

As a result, asbestos is often found intergrown as an "accessory mineral" within a talc deposit.  Serpentine tends to appear in talc deposits in mafic and ultramafic host rocks while amphiboles and serpentine tend to appear in talc deposits in sedimentary host rock.  The growth of talc and asbestos within either of these two types of host rock occurs by complex metamorphic processes.  According to Dr. Fitzgerald, the asbestos minerals most likely to be found as accessory minerals within talc are chrysotile, the fibrous form of serpentine, and the asbestiform varieties of three amphibole minerals:  actinolite, tremolite, and anthophyllite.

Summing up the geology and mineralogy of asbestos in general terms, Dr. Fitzgerald states that the three most common asbestos accessory minerals found in talc (anthophyllite, tremolite and chrysotile) "form under similar conditions in regional or contact metamorphism of ultramafic rocks especially in the presence of carbonates and water, as all of these minerals are hydroxylated magnesium silicates."  And according to Drs. Cohen and Finkelstein, who add an epidemiology perspective, of those three, all have

8

documented histories as carcinogens when humans are exposed to them in dust form.

### D. *Testing for Asbestos*

Asbestos fibers are very small, so small, in fact, that millions of fibers could fill the air in a room without anyone being able to perceive them with the naked eye. Testing to detect them, as a result, requires specialized technology that can identify particles at the level of microns, a unit of measurement that is approximately 70 times smaller than the breadth of a human hair.[8] These tiny fibers are distinguished by having a large aspect (length to diameter) ratio with highly parallel sides and are crystallized in an asbestiform morphology that causes them to separate into very thin fibers or fibrils. There are several analytical methods for detecting and identifying asbestos fibers. Each method has advantages and disadvantages. Bulk sampling identifies how much asbestos is in a product or material. Air sampling identifies how many asbestos fibers are released into the air.

For identifying asbestos in bulk materials, X-Ray Diffraction (XRD) determines the crystalline structure of minerals by measuring the response angles and intensities of an X-ray beam reflected through the lattice structure of a mineral. This method yields a mass percentage of different minerals present, but it has a detection limit around 1 percent for the regulated asbestos minerals and is incapable of detecting individual asbestos

---

[8] Microns are denoted by the symbol μm. Nowhere in any of the thousands of pages of often highly technical expert declarations in this case does any expert explain the relative size of a micron as a unit of measurement. Since the comparison of a micron to the breadth of a human hair is helpful for explanatory purposes, under Evidence Code section 451, subdivision (f), we will take judicial notice of it. (Ley, *Diameter of a Human Hair* (1999) in The Physics Factbook (Elert edit.) <https://hypertextbook.com/facts/1999/BrianLey.shtml> [as of Sept. 21, 2021].)

fibers. Polarized Light Microscopy (PLM), which can determine the different asbestos types by optical properties and asbestiform morphology, also allows positive asbestos identification at the level of individual fibers, but is limited in its resolution and does not allow for positive identification of smaller fibers (e.g., shorter than 5 μm long, or narrower than 0.25 μm, the types of fibers that, according to Dr. Fitzgerald, are typically found as contaminants in talc).

Some experts in asbestos materials testing—Dr. Fitzgerald, for example—believe that Transmission Electron Microscopy (TEM) is the most reliable instrument for detection and identification of all asbestos types, especially in air sampling because of its higher resolution and thus higher sensitivity to the presence of individual asbestos fibers. The high-energy electron beam used in TEM allows resolution of even the thinnest 0.02-μm asbestos fiber, and Selected Area Electron Diffraction (SAED) can determine if the crystalline structure is one of the asbestos mineral types. As a further refinement, an Energy Dispersive X-ray detector (EDX) interfaced with a TEM yields elemental composition, confirming particle chemistry. According to Dr. Fitzgerald, TEM can therefore determine the morphology, structure, and chemistry definitional to asbestos minerals, at a resolution capable of defining asbestos fibers at the finest level.

Other experts in asbestos materials testing—Dr. Sanchez, for example—believe that electron microscopy alone is a suboptimal method to test for the presence of asbestos. According to Dr. Sanchez, the combination of XRD and PLM has been approved by the United States Food and Drug Administration (FDA) as a method of testing talcum powder for decades. Dr. Sanchez holds the view that, because PLM analysis examines a greater number of particles than TEM analysis, and because TEM images alone only depict morphology—yielding accurate information only if used with SAED

according to a rigorous protocol called the Yamate Level III Method[9]—examination of populations of particles is best performed by PLM.

### E. *The Opinions of Dr. Fitzgerald and Dr. Compton*

In opposition to J&J's summary judgment motion, Dr. Fitzgerald opined for the Strobels that "geologists have known for well over a century of the intimate relationship between talc and asbestos." He further opined that, to determine the presence of asbestos as accessory minerals in talc mining ore, "we must closely and carefully examine" the talc formation from which the talc is mined, both from the "macroscopic geology of formation to the microscopic examination of materials and minerals as they change through time."

During the exposure period in question here—1951 through 2014—J&J obtained talc that was later formulated into JBP from three mining sources: (1) from 1951–1967, the Val Chisone and Val Germanasca region of Piedmont, Italy, (2) from 1968–2003, the Windsor region in the state of Vermont, and (3) from 2003–2014, from Guangxi Province, near Guilin City, in China. Dr. Fitzgerald opined without contradiction that metamorphic processes in all three of these areas are conducive to the formation of asbestiform anthophyllite, tremolite, or chrysotile as accessory materials within talc.

---

[9] According to Dr. Sanchez, "[t]he Yamate Level III Method is a TEM protocol that describes a quantitative type of SAED analysis. The Yamate Method has three increasingly rigorous levels of analysis, and under the Yamate Method Level III, in specified circumstances an analyst must obtain diffraction patterns from two different zone axes to positively identify a mineral as an amphibole. . . . This is particularly true in talc, where talc and anthophyllite, for example, can yield similar diffraction patterns depending on the orientation of the particle to the electron beam."

11

Dr. Fitzgerald tested samples from the Italian source ore and reported that, "I found both asbestiform anthophyllite and asbestiform tremolite, and occasionally chrysotile asbestos, not only present in the talc, but easily made airborne when product use was simulated by my own hand." Dr. Compton, a physicist with expertise in asbestos testing, tested talc ore samples from Italian and Vermont mining regions used by J&J and reported results consistent with those of Dr. Fitzgerald.[10]

According to Dr. Compton, "the asbestos content of . . . samples [for the Italian talc ore] found to contain amphibole and chrysotile fibers range[s] from approximately 1.7 to 660 million fibers per gram," and for the Vermont ore found to contain amphibole fibers, the range was 1.16 to 15.3 million fibers per gram. "Fiber release studies of consumer talc products within this range," Dr. Compton opined, show "elevated concentrations of airborne asbestos fibers during use of those products. It is expected that aerosolization of these samples or any powder consumer product containing these samples as a constituent ingredient would likewise result in elevated concentrations of airborne asbestos fibers."

Addressing J&J's Chinese talc, Dr. Fitzgerald relied primarily on the geology of the region. According to Dr. Fitzgerald, talc deposits in the Guangxi region are "[c]omprised chiefly of siliceous carbonate rock derived from marine sediments subsequently metamorphosed to low-grade greenschist assemblages." He explained, further, "it is well recognized

---

[10] The declaration of Dr. Fitzgerald references the ore samples he tested as "AGI 1615," a designation that he uses to describe ore as coming from a specific mining location in the Val Chisone/Val Germanasca region known as the Fontane Mine. Dr. Compton also tested ore from the Fontane Mine. According to Dr. Compton, the Fontane Mine has been in operation since the seventeenth century.

that the metamorphism of siliceous dolomites invariably forms tremolite, often fibrous." In addition to commenting on the regional geology of J&J's Chinese talc, Dr. Fitzgerald also observed that, in 2019, the FDA, through a contract laboratory, conducted tests of "Chinese talc-based Johnson & Johnson baby powder . . . , with repeated findings of asbestos in the products."

## F. *Summary Judgment for J&J*

Upon examination of the evidence presented in support of, and in opposition to, J&J's motion for summary judgment, the trial court determined that J&J carried its initial burden of production, thus shifting the burden to the Strobels on the issue of legal causation. After scrutinizing the Strobels' evidence in opposition to the motion, the trial court assumed arguendo that the Strobels had presented through Drs. Fitzgerald and Compton "competent direct evidence that samples of source ore associated with deposits at some source mines have been found to contain asbestos." But that was not enough to meet the test of legal causation. Looking downstream from the mining sources of talcum ore, the court focused on whether "the talc ore from a deposit that actually contained asbestos was milled into talcum powder and then actually used in JBP sold during Plaintiff's exposure period." The key witness on this issue was Dr. Fitzgerald, who tested five JBP samples obtained from J&J's historical archives, reporting positive tests for asbestos in four of them, but none of these asbestos-positive samples dated from within the exposure period.

The testing results in the record confirming the presence of asbestos in JBP marketed by J&J during the six-decade-plus exposure period at issue— presented with laboratory bench data specifying the number of asbestos structures counted—came from asbestos testing expert Dr. William Longo. Dr. Longo has presented these test results through testimony and expert

reports in other asbestos litigation against J&J, but he was not designated as an expert in this case. Drs. Fitzgerald, Cohen and Finkelstein all cited and relied on Dr. Longo's reported test results.[11] Drs. Finkelstein and Cohen had no foundation to rely upon Dr. Longo's test results, the trial court ruled, since his work was outside their area of expertise. And "to the extent" any of the Strobels' experts, including Dr. Fitzgerald, relied on Dr. Longo, the court ruled that their opinions were inadmissible case-specific hearsay under *Sanchez*.

The court overruled most of J&J's objections to Dr. Compton's proffered opinion, but since he tested only mined ore, it concluded that that still left a gap in the Strobels' evidence they could not overcome. Having ruled that, "to the extent" Drs. Fitzgerald, Cohen, and Finkelstein rely on inadmissible hearsay and that Mr. Ay was not competent to address the presence of asbestos in JBP, the trial court turned to the Strobels' remaining evidence of exposure to milled and formulated retail containers of JBP. The court noted the Strobels' evidence included a number of studies that have been published over the years reporting positive tests for asbestos in JBP samples, but concluded the Strobels failed to "establish a hearsay exception that permit[ted] [them] to use these documents to prove the truth of the matter, rather than the limited non-hearsay purpose of notice to [J&J]." Ultimately, the court found, the Strobels "fail[ed] to establish triable issues of fact to link the harvesting of a known deposit of asbestos-contaminated talc ore from a particular mine through the milling process and into a canister of JBP sold in stores during the exposure period."

---

[11] Mr. Ay stated it was his understanding that "talc, an ingredient in Johnson's baby powder used by Mr. Strobel . . . , contained asbestos," without specifying the basis of that statement.

14

## II.  DISCUSSION

### A. *Legal Standards*

We begin with familiar legal standards.

A trial court must grant a motion for summary judgment "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)  When, as here, defendants move for summary judgment, they can "meet their burden by demonstrating that 'a cause of action has no merit,' which they can do by showing that '[o]ne or more elements of the cause of action cannot be separately established . . . .' " (*Id.*, subd. (*o*)(1); *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 253.)  "The defendant has shown that the plaintiff cannot establish at least one element of the cause of action by showing that the plaintiff does not possess, and cannot reasonably obtain, needed evidence."  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 854.)

If that initial burden is met, the burden shifts to the plaintiff "to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto."  (Code Civ. Proc., § 437c, subd. (p)(2).)  "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof" (*Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 850), which here is the preponderance of the evidence (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 965 (*Rutherford*)).

" 'On appeal "[w]e review a grant of summary judgment de novo; we must decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law.  [Citations.]" [Citation.]  Put another way, we exercise our independent judgment, and

15

decide whether undisputed facts have been established that negate plaintiff's claims.' " (*Turley v. Familian Corp.* (2017) 18 Cal.App.5th 969, 977.)  We " 'accept as true the facts . . . in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn from them.' " (*Nazir v. United Airlines, Inc.*, *supra*, 178 Cal.App.4th at p. 254.)  And in undertaking our analysis, " 'we must " 'view the evidence in the light most favorable to [the plaintiffs] . . .' and 'liberally construe [the plaintiffs'] evidentiary submissions and strictly scrutinize [the] defendant['s] own evidence, in order to resolve any evidentiary doubts or ambiguities in [the plaintiffs'] favor.' " ' " (*Turley*, at p. 978.)

We must, however, disregard any evidence to which legally correct objections have been made and sustained.  (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334; Code Civ. Proc., § 437c, subd. (c).)  Since the trial court's evidentiary rulings excluding some of the Strobels' proffered evidence are central to its analysis, our standard of review of those rulings is crucial. As we discuss in part II.B.2.a., *post*, there is some dispute in the case law (and between the parties) as to whether the de novo standard or the abuse of discretion standard should apply.  "[T]he weight of authority holds that an appellate court reviews a court's final rulings on evidentiary objections by applying an abuse of discretion standard." (*Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694; see *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 852.)  But for reasons specific to this case cited in part II.B.2.a., *post*, we elect to employ a de novo standard of review.

Turning from procedure to substance, the applicable substantive law focus here is on legal causation.  As is frequently the case in asbestos litigation, that, in turn, requires us to consider the issue of exposure to asbestos.  To prevail on "a cause of action for asbestos-related latent injuries,

16

the plaintiff must first establish some threshold *exposure* to the defendant's defective asbestos-containing products." (*Rutherford*, *supra*, 16 Cal.4th at p. 982.) Here, the determinative issue is whether the Strobels presented sufficient admissible evidence to create a triable issue of whether a reasonable jury could conclude it was more likely than not that the JBP Doug Strobel used contained asbestos. (*LAOSD Asbestos Cases* (2020) 44 Cal.App.5th 475, 489.)

**B. *Analysis***

We conclude that the Strobels presented sufficient admissible evidence on legal causation to create a triable issue. On summary judgment, the parties offered the court two starkly different expert perspectives: There was, on the one hand, the view presented by Drs. Compton and Fitzgerald that J&J obtained talc ore from sources contaminated with asbestos during the exposure period, a premise from which these experts draw the inference that asbestos was present in JBP when Doug Strobel used it. On the other hand, there was the view presented by Dr. Sanchez that J&J sorted and screened its ore in the mining process to ensure only the most pristine talc was used for cosmetic products, and that suppliers were subject to strict testing requirements—established under an FDA-approved testing protocol— to confirm that source ore used to make JBP was asbestos-free.

Which of these competing views to accept must be decided at trial. Both camps of expert opinion extensively analyze historical records going back many decades, including government reports, published articles, and internal J&J memoranda, and arrive at opposite conclusions. One fundamental difference between the Fitzgerald and Compton perspective, on the one hand, and the Sanchez perspective, on the other, is in the respective methodologies the experts' laboratories chose to use in testing samples of talc ore. Dr. Compton's lab relied on a combination of XRD and TEM utilizing

17

microscopy equipment capable of both EDX and SAED, a testing approach Dr. Compton describes as generally accepted. Dr. Fitzgerald's laboratory used a combination of XRD and TEM with SAED; according to him, the approach used by his lab is in accord with Environmental Protection Agency (EPA) guidelines and published authority in the field of microscopy. The TEM-based microscopy testing protocols used by Drs. Fitzgerald and Compton are sensitive enough to produce images at the level of individual asbestos fibers.

Dr. Sanchez, by contrast, believes there is no generally acceptable methodology for TEM analysis. He prefers a combination of XRD and PLM, an approach approved by the FDA that his lab, RJ Lee Group, used. According to Dr. Sanchez, only by using this method can it be determined whether the sample ore being examined has a sufficient population of fiber bundles to indicate the presence of asbestiform fibers. In effect, he believes, the ultrasensitivity of TEM analysis is also its weakness. Without looking for populations of fibers of a specified size[12] that have asbestiform habit,

---

[12] Dr. Sanchez uses a definition of asbestos that requires fibers to have very specific dimensions. In his view, a population of fibers having asbestiform morphology generally exhibits several characteristics, including mean aspect ratios that are in the range of 20:1 to 100:1 for fibers greater than 5 µm long; that are less than 0.5 µm wide; and that have at least two or more of the following additional features: (1) parallel fibers occurring in bundles, (2) fiber bundles displaying splayed ends, (3) matted masses of individual fibers, and (4) fibers showing curvature. Dr. Fitzgerald believes that Dr. Sanchez's use of fiber populations and specified dimensions is an artificial way of excluding fibers less than 5 µm long that should be counted as asbestos structures. We note this point of definitional disagreement appears to be consistent with what has been reported about areas where consensus is lacking among causation experts in asbestos litigation. (See 3 Faigman et al., Modern Scientific Evidence (2020–2021 ed.) Areas of scientific disagreement—Mesothelioma, § 26:28 [["t]here is . . . disagreement

Dr. Sanchez believes, the "cleavage" in an individual fiber can easily be mistaken for an asbestiform fiber, generating a false positive test.[13] Whatever the merits of this line of critique, it goes to the weight and not the admissibility of the opinions offered by Drs. Fitzgerald and Compton confirming the presence of asbestos in Italian and Vermont source ore.

### 1. The Colgate-Palmolive Cases: *Berg* and *Lyons*

The trial court acknowledged that the Strobels presented competent, admissible evidence that there was asbestos in the Italian, Vermont and Chinese source ore used by J&J but concluded that was not enough to create a triable issue of fact. Relying primarily on *Berg v. Colgate-Palmolive Co.* (2019) 42 Cal.App.5th 630 (*Berg*), the court reasoned that without evidence that there was asbestos in any retail JBP product, as milled and formulated

---

[among experts] regarding the role of short (<5 µm) asbestos fibers in the causation of mesothelioma"].)

[13] Dr. Fitzgerald strongly disagrees with Dr. Sanchez's "cleavage fragment" theory. "I have reviewed numerous reports from Dr. Sanchez's laboratory," Dr. Fitzgerald states, "and, more often than not, structures are deemed 'cleavage fragments' . . . . In the calculations of concentrations on such reports, cleavage fragments are tabulated as non-asbestos, and therefore not counted." According to Dr. Fitzgerald, "[t]his practice is completely contradictory from the intent and letter of regulation specifying counting protocols for airborne asbestos." Thus, while Dr. Sanchez suggests that Dr. Fitzgerald's approach generates false positives, Dr. Fitzgerald suggests that Dr. Sanchez's approach generates false negatives.

Here too we have a difference of views between the opposing experts that is consistent with reported lack of consensus among causation experts in asbestos litigation generally. (See 3 Faigman et al., Modern Scientific Evidence, *supra*, Areas of scientific disagreement—Talc, mesothelioma and ovarian cancer, § 26:32, fns. omitted ["Experts disagree as to whether cosmetic talcum powder is contaminated with asbestiform minerals. Some have analyzed these samples and reported finding asbestos fibers, whereas others have not. The issue is clouded by the distinction between amphibole asbestos and amphibole cleavage fragments."].)

into JBP in the years 1951 to 2014, no reasonable jury could conclude that Doug Strobel's use of JBP during those years exposed him to asbestos. We disagree. This case is more like *Lyons v. Colgate-Palmolive Co.* (2017) 16 Cal.App.5th 463 (*Lyons*), which reversed a summary judgment grant for the defense in a case involving alleged exposure to asbestos in cosmetic talcum powder.

In *Berg*, the plaintiff sued Colgate-Palmolive in 2017 claiming that his exposure many years before to a talc shave product once sold by Colgate-Palmolive's corporate predecessor, the Mennen company, was a substantial factor in causing him to develop mesothelioma. (*Berg, supra,* 42 Cal.App.5th at p. 632.) The proof showed that, as a teenager, plaintiff Berg had been exposed to Mennen's talc shave product for a three- or four-year period between 1959 and 1961 or 1962, and during that period, he had used four to six containers of it. (*Ibid.*) The proof also showed that, during his life, plaintiff Berg "was exposed to other products that contained asbestos as part of their design, such as cigarettes with asbestos-containing filters." (*Id.* at p. 636.)

There, as in this case, the defendant built its case for lack of causation upon an opinion from Dr. Sanchez, who defined asbestos as a " 'group of six naturally occurring, highly fibrous silicate minerals' " that, " 'when crystallized in a rare asbestiform habit'—'likely account[ing] for less than 1% of the known world occurrences of each mineral'—'are regulated as asbestos.' " (*Berg, supra,* 42 Cal.App.5th at p. 632.) "Relying on studies by other researchers and his own testing, [Dr. Sanchez] opined that Mennen Shave Talc was 'free of asbestos' and, even if some of the raw talc sourced to make the product was contaminated with asbestos, there was no legitimate scientific basis on which to conclude that any particular container of shave

20

talc was contaminated." (*Ibid*.)  And there, as here, the plaintiff relied on an opinion from Dr. Fitzgerald, who testified that the raw talc from the mines where Mennen sourced talc ore contained asbestos.  (*Id*. at pp. 632–633.) Dr. Fitzgerald also tested Mennen's shaving talc product in 2016 and 2018— nearly 60 years after plaintiff Berg's last exposure to the product—in containers that "looked like" the ones the plaintiff used decades before.  (*Id*. at pp. 633, 636.)  The tested samples of Mennen shave talc revealed " 'countable structures of amphibole' minerals, the majority of which 'were clearly asbestiform in crystalline habit.' "  (*Id*. at p. 633.)

On that record, the Court of Appeal affirmed a summary judgment grant for Colgate-Palmolive, pointing out that plaintiff Berg had established no more than a possibility he had been exposed to asbestos in the accused Mennen product.  "[E]ven assuming that some talc from the North Carolina and Italy mines contained some level of asbestos," the trial court said, "the Fitzgerald declaration fails to support a conclusion that all or most of the Mennen Shave Talc containers sold from 1959 to 1962 contained asbestos." (*Berg, supra*, 42 Cal.App.5th at p. 636.)  Because "[t]he testing of the talc on which Fitzgerald relies, both his own and others', occurred decades after the period of Berg's use," the court concluded, "Berg's testimony that the containers Fitzgerald tested looked like the ones he used . . . falls far short of establishing that any containers of Mennen Shave Talc sold between 1959 and 1961 or 1962 contained asbestos, much less that it is more likely than not that the containers Berg used contained asbestos."  (*Ibid*.)

In *Lyons*, on the other hand, the appellate court reversed a summary judgment grant on a record where the "[p]laintiff alleged and at her deposition testified that she used" defendant Colgate-Palmolive's "Cashmere Bouquet talcum powder from the early 1950's to the early 1970's."  (*Lyons*,

21

*supra*, 16 Cal.App.5th at p. 465.)  After decades of applying Colgate-Palmolive's talcum powder regularly to herself upon bathing, plaintiff Lyons was diagnosed with mesothelioma in 2015, the same diagnosis Doug Strobel received in this case.  (*Ibid*.)  Although Lyons did not keep any of the containers of talcum powder that she had used and she had no evidence showing positive tests for asbestos in Cashmere Bouquet sold at retail, here too like Doug Strobel, she presented a declaration from Dr. Fitzgerald reporting positive test results for asbestos in raw talc taken from three mines used by Colgate-Palmolive as sources of ore for the manufacture of Cashmere Bouquet, including the Val Chisone mine in Italy.  (*Id*. at pp. 465–466.)  Dr. Fitzgerald proffered testimony that his lab conducted bulk testing of Cashmere Bouquet product and concluded that "[t]he results of such testing are consistent with the makeup of the product, the ore, and the geology of the talc sources used by its manufacturer, Colgate." (*Id*. at p. 467.)

Colgate-Palmolive contended Dr. Fitzgerald's declaration supported nothing more than a possibility of some asbestos in some Cashmere Bouquet sold at retail at some point in time, which left to conjecture whether the talcum powder the plaintiff used exposed her to asbestos.  (*Lyons*, *supra*, 16 Cal.App.5th at pp. 467–468.)  In support of its position, Colgate-Palmolive argued that Dr. Fitzgerald's testing of retail product had not been done on any tins of talcum powder that the plaintiff actually used and that his generally stated opinion as to the presence of asbestos in all Cashmere Bouquet lacked foundation.  (*Ibid*.)  The appellate court saw no basis for the evidentiary attack.  It pointed to Dr. Fitzgerald's opinion that "the evidence that talc from all three mines used in the manufacture of Cashmere Bouquet contained asbestos, repeatedly found in multiple tests and studies conducted before, during and after the 1950 to 1970 time period, coupled with plaintiff's

use of the product over those 20 years, particularly in the absence of evidence of any other source of the asbestos causing plaintiff's mesothelioma, creates more than an unsupported possibility." (*Id*. at p. 469.) "Rather," the court held, "there is a sufficient basis for the 'inference[] reasonably deducible from the evidence' that all or most of the Cashmere Bouquet that plaintiff used almost daily for 20 years contained harmful asbestos." (*Ibid*.)

As in *Lyons*, the summary judgment record here shows long term use of a talcum powder product alleged to contain asbestos by a mesothelioma sufferer who was not exposed to any other known source of asbestos above background asbestos levels that are ever-present in the environment, together with expert testimony reporting positive test results for the presence in the source ore used to manufacture the product. In the absence of evidence explaining how asbestos in the source ore would have been eliminated in the process of milling talc, that is enough to support more than a mere possibility that the accused product here, JBP, was a substantial factor in causing Doug Strobel to develop mesothelioma. *Berg*, by contrast, was a short-term use case in which the evidence tying the actual product the plaintiff used to the presence of asbestos in the product sold by the defendant during the exposure period was dubious. "The only basis on which to conclude that the samples tested were of the correct vintage was Berg's testimony that the containers Fitzgerald tested looked like the ones he used." (*Berg*, *supra*, 42 Cal.App.5th at p. 636.) Because of the evidence of long-term usage in this case, and because, as we explain below, Dr. Fitzgerald fairly draws the inference on this record that JBP of a vintage dating from within the exposure period contained asbestos, there is no such evidentiary gap in this case.

## 2. The Trial Court's Evidentiary Rulings

In *Lyons* and in this case, the plaintiff relied on more than simply an inference from the use of asbestos-positive sources of raw talc. Dr. Fitzgerald

23

reported asbestos-positive tests of sample JBP that were "consistent with" the use of asbestos-contaminated raw talc. (*Lyons*, *supra*, 16 Cal.App.5th at p. 467.) J&J contends that, on this critical point, the Strobels offer nothing more than hearsay from Dr. Longo about which Dr. Fitzgerald lacks personal knowledge. This line of argument tracks the trial court's reasoning. Without Dr. Longo's hearsay opinion, the trial court ruled, the only evidence of asbestos in samples of JBP offered for retail sale comes from Dr. Fitzgerald's testing of five canisters of JBP taken from J&J's historical archives. But four of those five canisters date from periods in time before Doug Strobel was born in 1951, and for the only canister dating from after 1951, Dr. Fitzgerald reported no test results. As a result, the court ruled, a fair inference may be drawn that the only samples of JBP tested by Dr. Fitzgerald dating from within Doug Strobel's lifetime tested negative for asbestos. In the absence of proof that the JBP actually marketed during the exposure period contained asbestos, according to the trial court, the Strobels were left with only inadmissible case-specific hearsay under *Sanchez* to establish exposure to an asbestos-containing product under *Rutherford*, *supra*, 16 Cal.4th 953.[14] Here, too, we disagree.

     a. *Standard of Review*

Trial courts always enjoy wide discretion to rule upon evidentiary objections. That is why most appellate courts apply an abuse of discretion

---

[14] J&J objected to Dr. Fitzgerald's declaration—along with proffered testimony from all of the Strobels' other experts—in part on lack of foundation grounds. As we read the trial court's rulings on J&J's evidentiary objections, the lack of foundation aspect of its exclusion of Dr. Fitzgerald's proffered opinion rests on its *Sanchez* ruling, and nothing more. Beyond that, "it is not clear in what respect the trial court considered the foundation for Fitzgerald's opinion to be lacking and any deficiency in that respect is not apparent." (*Lyons*, *supra*, 16 Cal.App.5th at p. 468.)

standard of review to the trial court's evidentiary rulings even in the context of a summary judgment motion.  (*Carnes v. Superior Court*, *supra*, 126 Cal.App.4th at p. 694.)  But "[t]o determine if a court abused its discretion, we must consider 'the legal principles and policies that should have guided the court's actions.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 (*Sargon*).)  "[T]he court's discretion" to exclude expert testimony in particular "is not unlimited" where it implicates a party's ability to present its case.  (*Ibid.*)  "Rather, it must be exercised within the confines of the applicable legal principles."  (*Ibid.*)

Quoting from *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, the Strobels urge us to review the trial court's evidentiary rulings de novo because we are dealing with a paper record on summary judgment.  (*Id.* at p. 535 [" 'Because summary judgment is decided entirely on the papers, and presents only a question of law, it affords very few occasions, if any, for truly discretionary rulings on questions of evidence.  Nor is the trial court often, if ever, in a better position than a reviewing court to weigh the discretionary factors.' "].) But the language they rely upon merely quotes from the Court of Appeal's superseded opinion in *Reid*.  The *Reid* court expressly declined to reach the issue of "whether a trial court's rulings on evidentiary objections based on papers alone in summary judgment proceedings are reviewed for abuse of discretion or reviewed de novo."  (*Ibid.*)

We see no reason to take a step the Supreme Court has chosen not to take.  But while we decline the Strobels' invitation to announce a generally applicable de novo standard of review for evidentiary rulings on summary judgment, we think the procedural setting we have here justifies de novo review on this record.  " 'The scope of [a trial court's] discretion always resides in the particular law being applied, i.e., in the "legal principles

25

governing the subject of [the] action . . . ." ' " (*Sargon*, *supra*, 55 Cal.4th at p. 773.)  Because the court's rulings sustaining objections to the Strobels' expert testimony rest, fundamentally, on the legal premises it adopted in applying *Sanchez*, we will review these rulings independently.

> b.  People v. Sanchez *and its Recent Progeny*

"In *Sanchez*," our Supreme Court "clarified the 'proper application' of our evidentiary law as it relates to the intersection of hearsay and expert testimony."  (*People v. Veamatahau* (2020) 9 Cal.5th 16, 25 (*Veamatahau*).)  The *Sanchez* court begins its analysis by explaining that "[t]he hearsay rule has traditionally not barred an expert's testimony regarding his general knowledge in his field of expertise."  (*Sanchez*, *supra*, 63 Cal.4th at p. 676.)  That starting premise is crucial to a proper understanding of the *Sanchez* rule governing case-specific hearsay.  *Sanchez* accommodates the pragmatic reality that, by dint of what experts do—they draw upon training in, experience with, and study of knowledge produced by others—this special category of witnesses must of necessity rely on hearsay sources.

"Because experts rely on hearsay knowledge and because a jury 'must independently evaluate the probative value of an expert's testimony,' including by assessing the basis of the expert's opinion, the expert is entitled to tell the jury the basis or ' "matter" upon which his opinion rests.' " (*Veamatahau*, *supra*, 9 Cal.5th at p. 25.)  But rather than let an expert freely place before the fact finder any hearsay "matter" that may be characterized as a basis of his or her opinion so long as it is not admitted for the truth, the *Sanchez* court refined the rules governing admission of expert testimony to make clear that such testimony may convey hearsay only if it is (1) general knowledge among those in the expert's field, or (2) independently provable by admissible evidence.  (*Sanchez*, *supra*, 63 Cal.4th at pp. 676–677.)

26

Under Evidence Code sections 801, subdivision (b), and 802, *Sanchez* holds, not only can an expert "*rely* on hearsay in forming an opinion," but he "may tell the jury *in general terms* that he did so." (*Sanchez, supra*, 63 Cal.4th at p. 685.) In so holding, *Sanchez* jettisons the need for the fact finder to recognize and maintain the elusive distinction between information coming from an expert that may be fully relied upon for the truth of contested facts, versus information that has been admitted for the limited purpose of evaluating the basis of the expert's opinion. (*People v. Nieves* (2021) 11 Cal.5th 404, 440 ["In *Sanchez*, we disapproved of the conclusion in prior decisions such as *People v. Gardeley* (1996) 14 Cal.4th 605, 618, that expert testimony about case-specific hearsay is not admitted for its truth and thus not subject to hearsay rules. (*Sanchez*, at p. 686, fn. 13.)"].)

In place of the old, limited admissibility regime under the *Gardeley* line of cases, *Sanchez* restores the traditional common law distinction between inadmissible case-specific hearsay and admissible background knowledge. (*Veamatahau, supra*, 9 Cal.5th at p. 25.) After *Sanchez*, what was once known as "basis" testimony coming from experts is now handled as a threshold matter of admissibility, rather than by assigning different probative purposes to already admitted evidence. An expert's testimony to background information is admissible—as it has always been, either as nonhearsay to the extent it rests on the expert's personal knowledge (*ibid.*), or under a hearsay exception to the extent it rests on information provided by others (*id.* at pp. 25–26 & fn. 1)—while testimony to case-specific facts is subject to exclusion, unless independently proved by admissible evidence (*id.* at p. 26).

"Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Sanchez,*

*supra*, 63 Cal.4th at p. 676.) Two recent California Supreme Court cases—neither of which the trial court had the benefit of considering—elucidate the proper application of this concept. At issue in the first of these cases, *Veamatahau*, *supra*, 9 Cal.5th 16, was the admissibility of an expert opinion from a prosecution criminalist identifying pills found in the possession of the defendant as alprazolam. (*Id*. at p. 22.) The expert, a criminalist named Scott Rienhardt, "held a degree in 'chemistry, with an emphasis in analytical chemistry[,]' . . . had previously worked for the Drug Enforcement Administration," and over the course of his career had tested for controlled substances thousands of times, and had identified alprazolam " 'hundreds' of times." (*Ibid*.) But despite his credentials as an analytical chemist, Rienhardt conducted no laboratory testing of the pills at issue. Instead, he matched the shape and markings on the pills to the images of pills in a database known as Ident-A-Drug. (*Id*. at pp. 23, 31.) On direct examination, Rienhardt testified that "it is standard practice to identify pharmaceutical pills by visual inspection, whereby one compares markings found on the pills against a database of imprints that the [FDA] requires to be placed on tablets containing controlled substances. He then testified that he performed this visual inspection on the pills seized from defendant and formed the opinion that they contained alprazolam." (*Id*. at pp. 26–27.) Then, on cross-examination, he went further, testifying more specifically that the Ident-A-Drug database " 'tell[s] you' " that pills displaying a certain imprint " 'contain[] alprazolam, 2 milligrams.' " (*Id*. at p. 27.)

Rienhardt's visual match of the seized drugs to the markings for alprazolam in the database, the court held, was not hearsay at all because he personally did the matching, and to the extent he drew on the accumulated knowledge of others reflected in the database to draw his ultimate conclusion

identifying the seized drugs as alprazolam, that came within the hearsay exception for background knowledge. (*Veamatahau, supra*, 9 Cal.5th at p. 27.) As the court saw it, Rienhardt did nothing more than employ his expertise to gather pertinent information and selectively choose and apply a methodology commonly used by experts in his field for analysis. (*Id.* at p. 29.) The court rejected the argument that, by relying on the Ident-A-Drug database, Rienhardt's ultimate conclusion merely conveyed to the jury the opinions of third parties. "Simply because the Ident-A-Drug Web site served as the basis for the expert's ultimate opinion does not make information from the site case-specific," the court observed. (*Id.* at p. 31.) "Information from the Ident-A-Drug database—that pills matching a certain description contain opioids—*was* hearsay but not case specific. It is no more case specific than if an expert divulged the equation—into which she entered the length of the skid marks she measured at the scene of the accident—to come to the conclusion that a defendant was traveling at the speed of 100 miles per hour before the crash." (*Ibid.*)

Resisting this conclusion, the defendant in *Veamatahau* contended that if an expert may simply consult a third-party source for his ultimate conclusion and convey that third party's conclusion to the fact finder as background information, the trial court's ability to vet the reliability of sources of third-party information "would be 'undercut' because the expert would be permitted to 'essentially vouch for the reliability of a source.' " (*Veamatahau, supra*, 9 Cal.5th at p. 32.) This paints a "false dichotomy," the court said. (*Ibid.*) Citing the backstop screening test for admissibility that trial courts must always undertake under the Evidence Code, the court explained that "[i]n fact, in law, and in practice, testimony admitted under section 801 or 802 [of the Evidence Code] is subject to scrutiny on reliability

29

grounds by the court and opposing counsel.  Section 801 specifies that the 'matter' on which an expert relies must be 'of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates.'  ([Evid. Code,] § 801, subd. (b).)  Thus, an expert must establish that the basis for his or her opinion is sufficiently reliable such that it 'reasonably may be relied upon' by experts testifying on the same subject." (*Veamatahau*, at p. 32.)

While *Veamatahau* illustrates the latitude experts are still given post-*Sanchez* to testify to background information relied upon in the formation of their opinions, a second *Sanchez* follow-on case, *People v. Valencia* (2021) 11 Cal.5th 818 (*Valencia*), shows how the rule barring case-specific hearsay places limits on that practice.  *Valencia* affirms the exclusion of case-specific hearsay in a gang prosecution case.  There, the defendant faced charges under the California Street Terrorism Enforcement and Prevention Act (STEP Act; Pen. Code, § 186.20 et seq.), a statute requiring the prosecution to prove, among other things, "a pattern of criminal gang activity" by the defendant or his gang associates.  (*Valencia*, at pp. 828–829.)  The defendant in *Valencia* was alleged to be a member of a gang known as Arvina 13.  (*Id.* at p. 827.)  To prove the requisite "pattern of criminal gang activity" by Arvina 13, Officer Ryan Calderon, an expert in gang activity, testified that members of Arvina 13 had committed certain predicate crimes on specified dates.  (*Ibid.*)

Appealing his conviction and sentencing enhancements imposed under the STEP Act, the defendant argued that Officer Calderon's testimony was inadmissible case-specific hearsay under *Sanchez*.  The California Supreme Court agreed and affirmed the reversal of the challenged conviction and sentence.  (*Valencia, supra*, 11 Cal.5th at pp. 837–839, 841.)  Picking up

30

where *Veamatahau* left off, the *Valencia* court further expounded upon the concept of background facts, as follows: "Hallmarks of background facts are that they are generally accepted by experts in their field of expertise, and that they will usually be applicable to all similar cases. Permitting experts to relate background hearsay information is analytically based on the safeguard of reliability. A level of reliability is provided when an expert lays foundation as to facts grounded in his or her expertise and generally accepted in that field." (*Id*. at p. 836.) On the other hand, the court held, "if experts give testimony that goes beyond their own experience or beyond principles generally accepted in their field, the justifications for allowing greater evidentiary latitude cease to apply." (*Ibid*.)

The predicate crimes testimony from Officer Calderon did not pass this test. *Sanchez* itself acknowledges, by the use of a specific example involving gang prosecution, that "general testimony about a gang's behavior, history, territory, and general operations is usually admissible. (See *Sanchez, supra*, 63 Cal.4th at p. 698.) The same is true of the gang's name, symbols, and colors. All this background information can be admitted through an expert's testimony, even if hearsay, if there is evidence that it is considered reliable and accurate by experts on the gang." (*Valencia, supra*, 11 Cal.5th at p. 838.) Officer Calderon's testimony about predicate crimes committed by Arvina 13 members—which was based on nothing more than "conversations with other officers and a review of police reports" (*id*. at p. 827)—had no such foundation in specialized knowledge generally accepted in his field or otherwise grounded in his expertise. "The proper role of expert testimony," the court held, "is to help the jury understand the significance of case-specific facts

proven by competent evidence, not to place before the jury otherwise unsubstantiated assertions of fact." (*Id.* at p. 837.)[15]

### c. *Dr. Fitzgerald's Opinion*

J&J's summary judgment motion took a rifle-shot approach to the evidence of causation in this case, primarily targeting the reliance the Strobels' experts placed on Dr. Longo's positive tests for asbestos in JBP. J&J objected on various grounds to the opinions offered by all of the Strobels' experts, but the principal focus of these objections—and most of the parties' attention in their appellate briefs—is on Dr. Fitzgerald's opinion.[16] "[O]nly with the particular facts of Longo's testing in evidence," J&J argues, could Dr. Fitzgerald "add general background knowledge to opine on their significance" in a way that is permissible under *Sanchez*. "Fitzgerald did not merely mention Longo without explanation on a list of reference materials," J&J argues. He "spelled out Longo's finding of asbestos contamination in 18 particular containers of JBP" and other J&J talcum powder.

---

[15] The parties discuss two STEP Act cases applying *Sanchez* (*People v. Bermudez* (2020) 45 Cal.App.5th 358, disapproved in *Valencia*, *supra*, 11 Cal.5th at p. 839, fn. 17; and our decision in *People v. Thompkins* (2020) 50 Cal.App.5th 365), with the Strobels relying on *Bermudez* and distinguishing *Thompkins*, and J&J relying on *Thompkins* and distinguishing *Bermudez*. *Bermudez* and *Thompkins* represent two sides in a split of appellate authority that was resolved in *Valencia*. (*Valencia*, at p. 839, fn. 17.) In light of *Valencia*, we need not address either case.

[16] J&J claims the Strobels do not contest the trial court's evidentiary rulings with respect to Drs. Cohen and Finkelstein and Mr. Ay. That is not how we read the record. The title of the principal section in the Strobels' opening brief addressing the court's evidentiary rulings focuses on the exclusion of "[e]xpert [t]estimony," and is not directed solely to Dr. Fitzgerald. And neither is the substance of the argument presented in this section of the opening brief limited to Dr. Fitzgerald. We therefore address the trial court's evidentiary rulings pertaining to Drs. Cohen and Finkelstein and Mr. Ay below in part II.B.2.d.

With J&J, we agree the trial court was correct to rule that Dr. Fitzgerald's opinion is inadmissible case-specific hearsay "to the extent that" he relates the specifics of Dr. Longo's testing data and results. Dr. Fitzgerald's reliance on Dr. Longo cannot be analogized to the criminalist's use of a database built from an FDA-approved drug classification system and generally used by forensic experts. It has long been settled that an expert may not simply repeat a third party's opinion and offer it up as confirmatory of his own. (*Whitfield v. Roth* (1974) 10 Cal.3d 874, 895 ["doctors can testify as to the basis of their opinion [citation], but this is not intended to be a channel by which testifying doctors can place the opinion of innumerable out-of-court doctors before the jury"]; *People v. Campos* (1995) 32 Cal.App.4th 304, 308 ["An expert witness may not, on direct examination, reveal the content of reports prepared or opinions expressed by nontestifying experts."].) The Strobels argue that even if Dr. Fitzgerald's reliance on the conclusion Dr. Longo drew from his testing JBP samples is inadmissible, his reliance on the underlying testing data and photographs used by Dr. Longo is properly admissible. We do not see this as a meaningful distinction. The specifics Dr. Fitzgerald presents from Dr. Longo's lab work—the numbers of samples that were positive for asbestos, and the numbers of asbestiform structures in those samples—simply report his results and thus impermissibly put before the finder of fact Dr. Longo's conclusion by proxy (see *Sanchez, supra*, 63 Cal.4th at p. 685 [expert may rely on case-specific hearsay in forming his opinion and "tell the jury *in general terms* that he did so"]), and Dr. Fitzgerald offers no independent interpretation of this information.

While the cases announcing this prohibition on rote repetition of the opinions of others predate *Sanchez*, we think the rule they enunciate remains

vital post-*Sanchez*. An absent witness's opinion may not be smuggled into evidence through an expert by dressing it up as background information. *Veamatahau* explains, as does *Valencia*, that background evidence must be generally relied upon by experts in the witnesses' field of expertise. While there may be situations where a much-published but absent expert whose views are well accepted in a particular field are repeated by a testifying expert to establish the premises of a proffered expert opinion, this is not one of them. The Strobels make no showing that Dr. Longo has published anything or that his work is generally relied upon by others. For Dr. Fitzgerald to testify that Dr. Longo detected specific quantities of asbestiform fibers in JBP samples dating from within the exposure period is no different, we think, than Officer Calderon testifying to the content of police reports to establish the historical fact that gang crimes were committed by members of Arvina 13 on specific dates in *Valencia*.

That does not end the inquiry, however. In its zeal to attack what it characterizes repeatedly as Dr. Longo's "made-for-litigation" testing results, J&J fails to account for the full breadth of the evidence the Strobels put forward in opposition to summary judgment. Both Dr. Sanchez and Dr. Fitzgerald selected and drew upon various published materials from government agencies and professional standard-setting groups,[17] published

---

[17] Dr. Fitzgerald—EPA; FDA; International Mineralogical Association; United States Geological Survey; Vermont Geological Survey. Dr. Sanchez—American Society for Testing and Materials; Chinese Pharmacopoeia; Cosmetic, Toiletry, and Fragrance Association; EPA; FDA; International Agency for Research on Cancer; International Organization for Standardization; U.S. Pharmacopeial Convention Talc Expert Panel.

34

academic articles,[18] published reports of "historical" testing,[19] as well as testing data from their own labs.  Dr. Fitzgerald and Dr. Sanchez disagree on the best tools to use for the detection of asbestos (TEM plus SAED and either or both of XRD and EDX [Dr. Fitzgerald], or XRD and PLM [Dr. Sanchez]), but both agree on what to look for:  Asbestiform materials of a specific type— anthophyllite, tremolite or chrysotile.  They draw different conclusions about whether the offending asbestiform minerals may be found in JBP, owing largely to their different views of the proper methods for counting asbestiform structures in tested samples of talc source ore and milled product.  But this dispute cannot be resolved on summary judgment by focusing exclusively on whether there was direct evidence of asbestos in milled JBP during the exposure period.

Even without Dr. Longo's testing data and results, we are satisfied that Dr. Fitzgerald formulated his opinion based upon principles generally accepted in his area of expertise and that he applied those principles upon a proper evidentiary foundation.  Ultimately, the exposure issue in this case will turn on principles of geology, mineralogy and asbestos testing.  Dr. Fitzgerald, a geologist with special expertise in asbestos detection, traced asbestiform minerals from the sources of raw talc J&J used to manufacture

---

[18] Dr. Fitzgerald—e.g., Deer, Howie, and Zussman (1962); Groppo and Compagnoni (2007); Hawthorne (2012); Lollino (2004); McCarthy (2006); Newman (1995); Peretti (1966); Rohl and Langer (1974); Sandrone and Zucchetti (1988); Shultz and Williams (1942); Van Gosen (2004); Webber (1998).  Dr. Sanchez—e.g., Blount (1991); Boundy (1979); Chidester (1951, 1964); Coggiola (2003); Li (1999); McCrone (1977); Pooley (1972); Rubino (1976); Sandrone and Zucchetti (1988); Wang (2003, 2006); Yan (2003).

[19] Dr. Fitzgerald—Colorado School of Mines (1971); Gail (1979); Johns Manville (1973); Lewin (1972); McCrone (1971); Pooley (1972); Shultz and Williams (1942).  Dr. Sanchez—Buzon (2016); Eiermann (1976); Lewin (1973).

JBP to the JBP Doug Strobel used.  In doing so, he drew inferences from a wide variety of data sources.  For example, Dr. Fitzgerald cites and relies on a 1972 FDA-sponsored study by Professor Seymour Lewin of New York University (the NYU Study) examining "195 standard, commercial cosmetic talc products," many of which he found to "contain[] detectable amounts of asbestiform  minerals," as well as a 1976 article published by A.N. Rohl and A.M. Langer (Rohl & Langer) reporting on the testing of 20 consumer products labeled as talc or talcum powder, including body powders and baby powders.[20]  Of the 20 product tests reported in Rohl & Langer, according to Dr. Fitzgerald, 10 found detectable amounts of tremolite and anthophyllite, principally asbestiform.[21]  In addition to the NYU Study and Rohl & Langer,

---

[20] It seems clear that Dr. Fitzgerald drew upon his knowledge as an asbestos testing expert in selecting these third-party source documents for their pertinence to his opinion.  Consider, for example, his discussion of why the electron microscopy testing methodology that generated the results reported in Rohl & Langer was, in his view, superior to older light microscopy techniques.  "The authors noted that while some asbestos was resolvable by light microscopy, most samples were too fine-grained, with particle dimensions [too] small for light microscopy, and that 'naturally occurring asbestiform minerals often lie below the working resolution capabilities of light microscope'.  They further noted that by comparing the results of optical microscopy and quantitative XRD with those from TEM analysis they observed that large numbers of fibers could go undetected by the less sensitive techniques.  Both asbestiform anthophyllite and asbestiform tremolite were found in that testing of cosmetic talcum powder, with the anthophyllite described as having greater length to width (aspect) ratios than the tremolite asbestos.  Furthermore, the anthophyllite asbestos concentration was reported as 4 to 5 times that of the asbestiform tremolite in that product, as tested and reported over 40 years ago."

[21] Dr. Sanchez claims that the FDA later disclaimed these positive findings for asbestos based on follow-up "light microscopy and differential thermal analysis" testing.  But Dr. Fitzgerald disagrees that the FDA's follow-up testing undercut Professor Lewin's original findings.  Among

36

Dr. Fitzgerald also relies on the FDA's reported findings in 2019 of JBP manufactured from Chinese talc (the 2019 FDA Report).

The trial court seems to have been aware that Dr. Longo's testing was not the sole source of third-party information relied upon by Dr. Fitzgerald, because, after concluding Dr. Fitzgerald's reliance on Dr. Longo was inadmissible under *Sanchez*, the court went on to emphasize in vague terms that its ruling on this point embraced other third-party documents as well. Without discussing, identifying or analyzing any of these documents, the trial court ruled that they were all inadmissible case-specific hearsay. Some of the third-party source material relied upon by both Dr. Fitzgerald and Dr. Sanchez may well be excludable on hearsay grounds when offered at trial.[22] But even assuming the court's broad-brush treatment of the "various

_____

several reasons Dr. Fitzgerald gives for disagreeing with Dr. Sanchez on this point is that the FDA did not use electron microscopy. As evidence offered by the nonmoving party in opposition to summary judgment, Dr. Fitzgerald's take on the NYU Study must be credited over that of Dr. Sanchez, at least at this stage of the proceedings.

[22] For example, in a discussion of talc ore from a mine in Vermont known as the Johnson Mine, Dr. Fitzgerald cites deposition testimony in other litigation from Dr. Glen Hemstock as well as a series of documents "pertaining to testing of Emtal ore, talc and plant facilities in the mid-to-late 1970s that detected the presence of asbestos . . . ." Dr. Hemstock's deposition testimony appears to be objectionable for the same reasons Dr. Longo's testimony in other litigation is objectionable. There is also no indication that any of the Johnson Mine testing reports cited by Dr. Fitzgerald were published or subjected to any other form of peer review.

Dr. Sanchez, for his part, cites testing of Vermont talc ore by "McCrone Laboratories, RJ Lee Group, and other third-party testers comprising test results covering J&J's talcum powder for the past 40+ years." Dr. Sanchez's testimony regarding testing by RJ Lee Group may be proper if he has personal knowledge of it, but like Dr. Fitzgerald's reference to testing of ore from the Emtal mine, there is no indication that any of the third-party

37

documents from third parties" cited by Dr. Fitzgerald qualifies as a clear enough exclusionary ruling to warrant treatment as a basis for the summary judgment ruling before us, we think the court erred in ruling that *all* of the third-party documents relied upon by Dr. Fitzgerald are inadmissible case-specific hearsay and therefore excludable along with the proxy opinion from Dr. Longo.  Granted, some of the third-party documents Dr. Fitzgerald relies upon are specific to the defendant (J&J) and to the accused product (JBP) in this case, but that alone does not make them case-specific hearsay, since, as the *Veamatahau* court pointed out, experts may always testify to ultimate facts.  (Evid. Code, § 805; *Veamatahau, supra*, 9 Cal.5th at p. 27.)

Rather, what is important is that the third-party documents chosen by Dr. Fitzgerald qualify as source material that may be reasonably relied upon by those in his field of expertise.  (*Veamatahau, supra*, 9 Cal.5th at p. 27.) Particularly when Dr. Fitzgerald's declaration is read as a whole, we see nothing in his proffered testimony to suggest that he is relying on " 'matter' " that cannot be deemed "sufficiently reliable such that it 'reasonably may be relied upon' by experts testifying on the same subject."  (Evid. Code, § 801, subd. (b); *Veamatahau*, at p. 32.)  J&J's own expert, Dr. Sanchez, proffers an opinion based on a "review of various governmental and academic studies on talc sourced from Val Chisone/Val Germanasca, Italy, southern Vermont, and Guangxi, China."  He even cites and discusses some of the same source materials Dr. Fitzgerald cites.  Because—apart from Dr. Longo's test results—most of the background material relied upon by Dr. Sanchez is

testing to which Dr. Sanchez makes general reference was personally known to him, published or otherwise subjected to some form of peer review.

    We take no view of whether, on appropriate objection at trial, any of the third-party sources relied upon by Drs. Fitzgerald or Sanchez may be excludable on hearsay or other grounds, in whole or in part.

generically comparable to the background information Dr. Fitzgerald relies upon, we think J&J has implicitly confirmed the reliability of Dr. Fitzgerald's sources by endorsing Dr. Sanchez's reliance on sources of the same general type.

J&J attempts to argue that, without Dr. Longo's testing results, Dr. Fitzgerald's opinion rests on " ' "assumptions of fact without evidentiary support" ' " (*Sargon*, *supra*, 55 Cal.4th at p. 770) and is therefore inadmissible as speculative under *Sargon*.  We cannot agree.  Dr. Fitzgerald traces asbestos contamination from mined talc ore to milled JBP, drawing inferences from a variety of data sources, including published papers, government reports, internal J&J documents, testing of source ore by Dr. Compton, as well as Dr. Fitzgerald's own testing of archival J&J samples of JBP.  J&J has many points of disagreement with Dr. Fitzgerald, but none exposes an " 'analytical gap between the data and the opinion proffered' " that is " 'simply too great' " to be countenanced.  (*Sargon*, at p. 771.)  Under *Sargon*, the trial court "does not resolve scientific controversies."  (*Id*. at p. 772.)  "Rather, it conducts a 'circumscribed inquiry' to 'determine whether, as a matter of logic, the studies and other information cited by experts adequately support the conclusion that the expert's general theory or technique is valid.' "  (*Ibid.*)

J&J argues there is a fatal gap in Dr. Fitzgerald's logic—and hence in the Strobels' proof—because he reported positive tests for asbestos in archival samples of JBP though the 1940's, yet produced no such report for any sample during Doug Strobel's lifetime.  We are not convinced this feature of Dr. Fitzgerald's opinion can bear the weight J&J places on it.  Dr. Fitzgerald confirmed through his own testing that there is asbestos contamination in archival samples of JBP dating from the late 1940's, which is consistent with

39

testing on samples of source ore from the Val Chisone and Val Germanasca region conducted by him and by Dr. Compton.[23]  It is reasonable to infer from these tests of Italian source ore that this contamination was still present in JBP at least through 1968, when J&J shifted its sourcing of talc ore from Italy to Vermont.  And in light of the 2019 FDA Report, the NYU Study, and Rohl & Langer, it seems fair to draw the further inference that asbestos was present in JBP throughout the entire exposure period.  Drawing the opposite inference in favor of J&J, as the trial court did—based on a negative inference that there is no proof of asbestos in JBP after 1951 based on the absence of any positive asbestos test in archival samples from J&J post-dating Doug Strobel's birth—violates the fundamental rule that we must construe the evidence liberally for the nonmoving party.

---

[23] J&J argues that Dr. Compton's testing approach, if scrutinized properly, cannot be accepted as reliable for admissibility purposes because it is not based upon "a methodology generally accepted in the scientific community for identifying asbestos in cosmetic talc."  Dr. Compton's "TEM methodology . . . used to count 'structures,' " J&J points out, "could not distinguish an asbestos fiber from nonasbestiform particles."  In support of this contention—a line of attack which, notably, J&J does not pursue with respect to Dr. Fitzgerald (except to the extent Dr. Fitzgerald relies on Dr. Longo)—J&J cites the *Kelly* test, an evidentiary screening tool designed to test the reliability of novel methods of scientific proof for general acceptance within the relevant scientific community.  (*People v. Kelly* (1976) 17 Cal.3d 24, 30–31; see *People v. Azcona* (2020) 58 Cal.App.5th 504, 510 ["General acceptance means 'a consensus drawn from a typical cross-section of the relevant, qualified scientific community.' "].)  This was not the basis for the trial court's exclusion of any of the Strobels' expert testimony.  We therefore have no occasion to address the potential applicability of the *Kelly* test or how that test may relate to reliability testing for purposes of *Sanchez*, except to point out that both sides' proffered expert testimony may be subject to further screening at trial, including through an Evidence Code section 802 hearing should the trial court deem it appropriate to hold such a hearing.

J&J insists it is sheer conjecture to infer the presence of asbestiform minerals in JBP from nothing more than the presence of these minerals in talc ore used to manufacture JBP. Pointing to its own evidence, J&J claims it "maintains the industry's highest standards for the talc it uses to manufacture its talcum powder products, including JBP"; its "[c]osmetic talc is selectively mined, and talc ore is carefully sorted at different stages"; and that "only about 5% of mined talc is selected for use as cosmetic talc." J&J also extols the "purity" of its "talc ore", emphasizes that finding talc ore accessory minerals in asbestiform habit is "rare"—occurring in less than 1 percent of the known occurrence of each mineral—and claims it "has long conducted a regular monitoring program to test its talc supply using methods that exceed industry and regulatory standards to confirm the talc is not contaminated with asbestos." Dr. Sanchez, whose opinion J&J principally relied upon and the trial court accepted on summary judgment, pointed to no evidence demonstrating that J&J's sorting, screening and selectivity processes are capable of weeding out from raw talc submicron-size asbestiform particles or that it is even possible to achieve such "purity." But we acknowledge that these arguments could ultimately prevail at trial. Although we would not describe the Strobels' summary judgment showing on legal causation as overwhelming, we see ample circumstantial evidentiary support for the inference Dr. Fitzgerald draws that asbestos contamination was persistently present in JBP throughout the exposure period.

d. *The Opinions of Drs. Cohen and Finkelstein and Mr. Ay*

Turning, finally, to the trial court's rulings that the opinions from Dr. Cohen, Dr. Finkelstein and Mr. Ay were inadmissible "to the extent" they rely on Dr. Longo and other third-party sources of information concerning whether JBP contained asbestos during the time Doug Strobel used it, we conclude that those rulings were correct. Dr. Cohen and Dr. Finkelstein

41

show considerable familiarity with geology, mineralogy and asbestos testing, but neither of them purports to be an expert in these areas. And while Mr. Ay has some familiarity with asbestos testing, he has none in geology and mineralogy or asbestos exposure from nonoccupational sources. Thus, the trial court was within its discretion to rule that none of these witnesses is competent to give testimony about the presence of asbestos in JBP. For any of them to pass along third-party geological and mineralogical opinions outside the ambit of their areas of expertise—without the qualifications necessary to gauge the reliability of the information, and without any independent ability to build upon it in formulating their own opinions— amounts to allowing them to channel someone else's views to the fact finder. That has never been allowed (*Whitfield v. Roth*, *supra*, 10 Cal.3d at p. 895), and is still not allowed, as *Valencia* illustrates. (See *Valencia*, *supra*, 11 Cal.5th at pp. 826, 836–840.)

Our holding with respect to Dr. Cohen, Dr. Finkelstein and Mr. Ay should not be read to mean that, at trial, they may be barred from mentioning the presence of asbestos in JBP, or the geology, mineralogy or asbestos testing issues pertinent to that issue. Within their own ambits of expertise, Dr. Cohen, Dr. Finkelstein and Mr. Ay each proffers an opinion that is relevant to the ultimate question under *Rutherford* whether, taking into account "the length, frequency, proximity and intensity of exposure, the peculiar properties of [JBP], any other potential causes to which the disease could be attributed," along with other factors bearing on comparative fault, Doug Strobel's "inhalation of fibers from [JBP] [may] be deemed a 'substantial factor' in causing [his] cancer." (*Rutherford*, *supra*, 16 Cal.4th at p. 975.) Because there is likely to be some subject matter overlap in the opinions offered by all of the Strobels' causation experts, it should be kept in

42

mind that, for any expert relying on another expert outside his area of expertise, the "distinction between generally accepted background information and the supplying of case-specific facts is honored by the use of hypothetical questions. 'Using this technique,' . . . [a]n examiner may ask an expert to assume a certain set of case-specific facts for which there is independent competent evidence, then ask the expert what conclusions the expert would draw from those assumed facts." (*Sanchez*, *supra*, 63 Cal.4th at pp. 676–677.) Upon properly structured hypothetical questions, therefore, Dr. Cohen, Dr. Finkelstein and Mr. Ay may be asked to assume the truth of Dr. Fitzgerald's view that JBP contained asbestos during the years Doug Strobel used it, or any of the bases for his opinion, and on that foundation, to offer their own opinions upon the closely related epidemiological, toxicological or occupational health questions the finder of fact may be called upon to address in resolving the broader issue of legal causation.

## III.  DISPOSITION

The order granting summary judgment and the judgment entered upon it are reversed and the cause is remanded for further proceedings consistent with this opinion.  Jo Ann Strobel, prevailing appellant, shall recover the Strobels' costs on appeal.

                                                    STREETER, Acting P. J.

WE CONCUR:

TUCHER, J.*
BROWN, J.

---

* Presiding Justice of the Court of Appeal, First Appellate District, Division Three, sitting by assignment pursuant to article VI, section 6 of the California Constitution.

Trial Court:  Solano County Superior Court

Trial Judge:  Hon. Wendy G. Getty

Counsel:  Brayton Purcell, Gilbert L. Purcell, Richard M. Grant,
Steven J. Patti, Christine A. Renken,
for Plaintiff and Appellant.

King & Spalding, Paul R. Johnson, Alexander G. Calfo,
Susan V. Vargas, Stacy L. Foster; Orrick Herrington &
Sutcliffe, Robert M. Loeb, *pro hac vice*, Nathan Dullum,
for Defendants and Respondents.

A159609